**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile:  (212) 989-9163
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIKKA ALLMON, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiff,<br><br>            v.<br><br>EXTENDED STAY AMERICA, INC.,<br><br>                                    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Erikka Allmon files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Extended Stay America, Inc. ("Defendant" or "Extended Stay America").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all California residents who have accessed and used extendedstayamerica.com (the "Website"), a website that Defendant owns and operates.

2.      Defendant aids, employs, agrees with, or otherwise enables several third parties – Adobe Inc. ("Adobe"); LinkedIn Corp. ("LinkedIn"); and Meta Platforms, Inc. ("Meta") (collectively, the "Third Parties") – to eavesdrop on communications sent and received by Plaintiff and Class Members, including communications that contain sensitive and confidential information (i.e., "guest records," as defined by Cal. Civil Code § 53.5.  By failing to procure consent before enabling the Third Parties' interception of these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## PARTIES

3.      Plaintiff Erikka Allmon is a resident and citizen of Oakland, California.  In or around 2006, Plaintiff Allmon created a Facebook account.  Several times, including on or around March 31, 2024, and April 11, 2024, Plaintiff Allmon visited Defendant's Website, extendedstayamerica.com, on the same browser that she used to access Facebook.  Plaintiff Allmon was in California when she visited the Website.  Upon accessing the Website, as alleged in greater detail below, Plaintiff Allmon browsed and booked an Extended Stay America hotel.  Each of these communications was intercepted in transit by the Third Parties – as enabled by Defendant – including communications that contained Plaintiff Allmon's confidential "guest records," as defined by Cal. Civil Code § 53.5.  Neither Defendant nor the Third Parties procured Plaintiff Allmon's prior consent to this interception.

4.      Defendant Extended Stay America, Inc. is a Delaware corporation with its principal place of business at 13024 Ballantyne Corporate Place, Charlotte, NC, 28277.  Defendant does business across the nation and operates several hotels throughout California.[1]

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

6.      The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities.  Plaintiff accessed and navigated the Website while in California, and Defendant assisted the Third Parties with intercepting Plaintiff's communications in this District.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

**I.      The California Invasion of Privacy Act**

8.      The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

9.      The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

---

[1] https://www.extendedstayamerica.com/hotels/ca.

10.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

11.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

12.     CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

13.     As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

14.     A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

15.     Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).  Plaintiff does so, here, against Defendant.

## II.    California Civil Code § 53.5

16.    As the California Legislature recognized, a "guest record" maintained by an owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations is confidential.  Such an owner or operator "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order."  Cal. Civil Code § 53.5(a).

17.    Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

18.    Further, the legislative history of § 53.5 indicates:

> (a) In 1972, California voters amended the California Constitution to include the right of privacy among the "inalienable" rights of all people. The amendment established a legal and enforceable right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use of their personal information.

> (b) Since California voters approved the right of privacy, the California Legislature has adopted specific mechanisms to safeguard consumer privacy, including the California Consumer Privacy Act of 2018, the Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights for California Minors in the Digital World Act, and Shine the Light, a California law intended to give Californians the 'who, what, where, and when' of how businesses handle consumers' personal information.

> (c) Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; or stay at a hotel or motel.

> (d) California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

> (e) Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a

consumer has, where a consumer lives and works, where a consumer travels and where they stay on their trip, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

(f) The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.

(g) When Californians leave their homes to travel via bus or stay at lodging establishments throughout their state, they desire assurances that these businesses will respect their privacy and safeguard their personal information from improper disclosure.

(h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.

(i) Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed.

California S.B. 1194 (September 27, 2018).[2]

19.     Here, Website users' communications with Extended Stay America – made while browsing and booking Extended Stay America hotels via the Website – contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

20.     First, the communications include "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c).  As described *infra*, §§ IV, VI, Defendant enables Adobe to identify individual Website users with the Adobe Experience Cloud Identity Service and/or Adobe Experience Platform Identity Service, which collect and utilize cookie IDs, cross-device IDs, device IDs, email addresses, and/or phone numbers.  Defendant enables LinkedIn to identify individual Website users by their respective LinkedIn member accounts, utilizing several cookies, including the _guid; lms_ads; and lms_analytics cookies.  Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp

---

[2] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1194.

cookies. Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., name, email address, phone number, etc.).  These pieces of data collected by Adobe, LinkedIn, and Meta constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies and other IDs at issue contain "unique identifying number[s]" assigned to Website users (*id.*) and the contact details (i.e., name, email address, phone number, etc.) at issue are sufficient to identify individuals.  *Id.*

21.    Website users' communications with Extended Stay America also "identif[y] an individual [as an Extended Stay America] guest, boarder, occupant, lodger, customer, or invitee[.]"  *Id.*  The Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay. The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications.  These communications "identif[y] an individual [as an Extended Stay America] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Extended Stay America – individuals with "express or implied invitation to enter or use [Extended Stay America's] premises."[3]  These communications also identify certain Website users (those who complete the booking process) as Extended Stay America hotel "guests" and "customers."

22.    Thus, the Third Parties – as aided by Defendant – intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5.  Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because none of the Third Parties is "an entity contracted to provide services outlined in [a] contract [with Extended Stay America] that has no independent right to use or share the data beyond the terms of the contract." Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant.  *See infra*, § VII.  Therefore, Defendant's conduct here at issue was not permitted by, *inter alia*, Cal. Civil Code § 53.5(i).

---

[3] INVITEE, Black's Law Dictionary (11th ed. 2019).

### III.    Overview of Defendant's Website

23.    Defendant owns and operates the Website.  Defendant has integrated the Third Parties' wiretaps into the Website.

24.    On the Website, Website users can, *inter alia*, browse and book Extended Stay America hotels.  When doing so, Website users provide Defendant with confidential information, including "guest records" under Cal. Civil Code § 53.5.  *See supra* § II.

25.    Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables the Third Parties to eavesdrop on those confidential communications using the Third Parties' respective wiretaps, as set out *infra*.

26.    Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated).  Instead, as set out below, the confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections.  All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

27.    Website users may browse and book Extended Stay America hotel rooms.  To do so, users type and/or select from a list the destination to which they wish to travel. Next, users click the dates for their trip, the number of rooms required, the number of adults and children who will be traveling, and/or special rates for which they are eligible.  The Third Parties, as enabled by Defendant, contemporaneously intercept Website users' button clicks selecting such items:

//

//

//

//



Website "Screen 1"

28.     Then, Website users review the Extended Stay America hotels located in or near their destination and click on a particular hotel to book.



Website "Screen 2"

29.    Website users subsequently pick the type of room (i.e., double, queen, king bed, etc.) in which they wish to stay.



**Website "Screen 3"**

30.    Finally, Website users check out by typing their personal information (first and last name, email, phone number) and entering their payment information.



**Website "Screen 4"**

## IV.    Overview of the Third Parties' Tracking Technologies

31.    Adobe, LinkedIn, and Meta each wiretap the Website with their respective tracking technologies, which Defendant purposefully installed on the Website.

32.     The Third Parties' tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening.  The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to the Third Parties' servers alongside additional information about the Website user's identity.  This entire process occurs within milliseconds.  In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant.  Thus, the Third Parties' interception of these communications occurs "in transit."  *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, 710 F. Supp. 3d 942, 961-62 (N.D. Cal. 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

## A.     Adobe

33.     Adobe wiretaps the Website with trackers associated with the "Adobe Experience Cloud."[4]  These trackers, at minimum, comprise of Adobe Experience Platform Tags,[5] which are pieces of "code … that [website operators, like Defendant] put on [their] webpages to load and execute [certain] logic"[6] and "send [data] to [] marketing and advertising solutions[.]"[7]  This includes

---

[4] *See* ADOBE, ADOBE EXPERIENCE CLOUD, https://business.adobe.com; ADOBE, DATA INSIGHTS & AUDIENCES, https://business.adobe.com/solutions/data-insights-audiences.html; ADOBE, ADOBE EXPERIENCE CLOUD PRODUCTS, https://business.adobe.com/products/adobe-experience-cloud-products.html; ADOBE, ENTERPRISE DOCUMENTATION, https://experienceleague.adobe.com/en/docs.

[5] ADOBE, TAGS OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/home.

[6] ADOBE, ADD THE EMBED CODE, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/configure-tags/add-embed-code.

[7] ADOBE, ADD A DATA ELEMENT, A RULE AND A LIBRARY, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/configure-tags/add-data-elements-rules.

1    when there is "a page load, a click, a custom JavaScript event, etc."[8]

2    34.    On information and belief, Defendant's deployment of the Adobe Experience Cloud

3    involves a number of "tag extensions"[9] that "extend[] the functionalities provided by [the Adobe

4    Experience Platform] tags[.]"[10]  Specifically, analysis of the Website reveals that Defendant utilizes

5    the Adobe Analytics, Adobe Target, and Adobe Experience Cloud Identity Service extensions,[11]

6    among others. *See infra*, § VI.

7    35.    Adobe Analytics[12] offers "real-time insights based on a holistic view of [the]

8    customer[,]"[13] including "complex segmentation and predictive tools for analyzing website traffic[]";

9    "marketing analytics" that "help[] organizations understand where customers interact with their

10   brands, which channels customers prefer, and which experiences resonate with them[]";

11   "[a]ttribution [that] lets organizations see how different interactions throughout the customer journey

12   affect conversion[]"; and "[p]redictive analytics [that] uses machine learning and advanced statistical

13   modeling to analyze customer data, find patterns, and predict future behavior[.]"[14]

14   36.    Adobe Target[15] can be used to "[c]reate A/B and multivariate tests to learn the most

15   effective combination of content, layouts, UX, and more through [] websites[.]"[16]  With "AI and

16   machine learning, powered by Adobe Sensei, [clients] can test and personalize at scale well beyond

17   _____

18   [8] *Id.*

19   [9] ADOBE, EXTENSIONS OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/extensions/overview.

20   [10] *Id.*

21   [11] *See* ADOBE, IMPLEMENT THE EXPERIENCE CLOUD IN WEBSITES WITH TAGS TUTORIAL, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/overview.

22   [12] *See* ADOBE, ADD ADOBE ANALYTICS, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/implement-solutions/analytics; ADOBE, ADOBE ANALYTICS

23   EXTENSION OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/extensions/client/analytics/overview.

24   [13] ADOBE, ADOBE ANALYTICS, https://business.adobe.com/products/analytics/adobe-analytics.html

25   [14] ADOBE, ANALYTICS USE CASES, https://experienceleague.adobe.com/en/docs/analytics/analyze/admin-overview/use-cases.

26   [15] *See* ADOBE, ADD ADOBE TARGET, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/implement-solutions/target; ADOBE, ADOBE TARGET EXTENSION

27   OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/extensions/client/target/overview.

28   [16] ADOBE, ADOBE TARGET BENEFITS, https://business.adobe.com/products/target/benefits.html.

_____

what [they've] been able to achieve with manual or rules-driven approaches alone."[17]

37.    The Adobe Experience Cloud Identity Service[18] is used, in conjunction with the Adobe Experience Platform Identity Service, to "piece together a complete picture of [a] customer" by "link[ing] their disconnected identi[fiers,]" which Adobe calls "identities[.]"[19] "Identities" that are collected and stitched together include, *inter alia*: "[c]ookie IDs"[20] such as "the Experience Cloud ID (ECID)"[21] that "identify web browsers"[22]; "[c]ross-device IDs" such as "CRMID" that "identify an individual and [] tie other IDs together"; "[d]evice IDs" such as "IDFA (iPhone and iPad), GAID (Android), and RIDA (Roku)" that "identify hardware devices"; "[e]mail addresses"; and "[p]hone numbers[.]"[23] This data is presented visually in an "identity graph[,]" which is a "map of [the] relationships between [] identities" (i.e., cookie IDs, cross-device IDs, device IDs, email addresses, phone numbers, etc.) "for a single individual[.]"[24] Ultimately, said identity graphs (and the data contained therein) can be used to gain a comprehensive "view of individual customers and their

---

[17] *Id.*

[18] *See* ADOBE, ADD THE ADOBE EXPERIENCE PLATFORM IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/implement-solutions/id-service; ADOBE, ADOBE EXPERIENCE CLOUD IDENTITY SERVICE EXTENSION OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/extensions/client/id-service/overview.

[19] ADOBE, ADOBE EXPERIENCE PLATFORM IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/experience-platform/identity/home.

[20] ADOBE, IDENTITY NAMESPACE OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/namespaces.

[21] ADOBE, ADOBE EXPERIENCE CLOUD IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/home. *See also* ADOBE, HOW THE EXPERIENCE CLOUD IDENTITY SERVICE REQUESTS AND SETS IDS, https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request; ADOBE, COOKIES AND THE EXPERIENCE CLOUD IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies.

[22] ADOBE, IDENTITY NAMESPACE OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/namespaces. *See also* ADOBE, ADOBE EXPERIENCE PLATFORM IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/experience-platform/identity/home ("[t]he browser identifier (such as ECID) [] represents the web browser.").

[23] *Id.*

[24] ADOBE, IDENTITY AND IDENTITY GRAPHS OVERVIEW, https://experienceleague.adobe.com/en/docs/platform-learn/tutorials/identities/understanding-identity-and-identity-graphs.

---

behavior"[25] and identify them "across all applications in Adobe Experience Cloud."[26]

**B.    LinkedIn**

38.    LinkedIn wiretaps the Website with trackers associated with the "LinkedIn Insight Tag," which is a "code snippet [that website operators, like Defendant] add[] to [their] website[s] [to] help [] optimize [advertising] campaigns, retarget [] website visitors, and learn more about [website] audiences."[27]    The "LinkedIn Insight Tag enables the collection of data regarding [individuals'] visits to [a] website, including [] URL, referrer, IP address, device and browser characteristics (User Agent), [] timestamp[,]" and "actions [such as ]button clicks, page visits, and form submissions[.]"[28]

39.    The Insight Tag "relies on LinkedIn cookies, which enable [LinkedIn] to match [] website visitors to their respective LinkedIn member accounts. Once matched, [LinkedIn] can tally [website users'] actions in Campaign Manager so [advertisers] can use the data to analyze [a] website's conversion flows and optimize [] ad campaigns."[29]    Notably, advertisers can "[t]arget [] ideal customer[s] based on traits like their job title, company name, industry, and by professional or personal interests" and "deliver unique content based on actions [a website user] ha[s] taken[.]"[30] Website operators can also "add enhanced matching … [to] send additional information with [] Insight Tag data, such as an email address provided when a customer submits a form on [a] website."[31]    This helps "match [even] more [ ] website visitors to LinkedIn accounts."[32]

[25] ADOBE, IDENTITY NAMESPACE OVERVIEW,
https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/namespaces.

[26] ADOBE, ECID OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/ecid.

[27] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[28] LINKEDIN, UNDERSTANDING WEBSITE ACTIONS, https://www.linkedin.com/help/lms/answer/a1377941.

[29] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[30] LINKEDIN, AD TARGETING, https://business.linkedin.com/marketing-solutions/cx/21/10/ad-targeting. *See also* LINKEDIN, MATCHED AUDIENCES, https://business.linkedin.com/marketing-solutions/ad-targeting/matched-audiences; LINKEDIN, CONVERSION TRACKING, https://business.linkedin.com/marketing-solutions/conversion-tracking.

[31] LINKEDIN, ENHANCED MATCHING FOR YOUR WEBSITE,
https://www.linkedin.com/help/lms/answer/a6241147.

[32] *Id.*

**C.    Meta**

40.    Meta wiretaps the Website with trackers associated with the "Meta Pixel."[33] According to Meta, "[t]he Meta Pixel is a snippet of JavaScript code that allows [clients] to track visitor activity on [their] website[s]. It works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[34]    Meta offers a menu of "standard events" that can be tracked, including what content a visitor views or purchases.[35]    Advertisers can also create their own tracking parameters by building a "custom event."[36]    Thus, the Meta Pixel helps "understand[] the actions people take on [a] website."[37]

41.    The Meta Pixel "relies on Facebook cookies, which enable [Meta] to match [] website visitors to their respective Facebook User accounts."[38]    Additionally, "[w]ith advanced matching, [website operators] can send [Meta] hashed customer information along with [] Meta Pixel events, which can help … match more of the conversions that happen on your website to people on Meta."[39]

42.    This is highly useful for marketing and advertising.    Specifically, the Meta Pixel can be used to help "measure ad effectiveness"; "define custom audiences for ad targeting"; and support "Advantage+ catalog ads campaigns[.]"[40]

43.    With respect to measuring ad effectiveness, "[t]rack[ing ] website visitors' actions[,]

---

[33] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[34] *Id.*

[35] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655.  *See also* META, STANDARD EVENTS, https://developers.facebook.com/docs/meta-pixel/reference.

[36] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[37] *Id.*

[38] META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[39] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[40] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

---

also known as conversion tracking[,] ... can be used to … calculate [] return[s] on ad investment[s]."[41] "In [the] Meta Ads Manager, [website operators] can see how many conversions happened as a result of [their] Meta ads."[42]  This includes "cross-device reporting, which lets [advertisers] see cross-device conversions across apps and the web (for example, if a customer sees an ad for a product on their mobile phone, but decides to buy it later on their desktop computer)."[43]

44.    A "custom audience is an ad targeting option"[44] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[45]  Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action.  Once [an] ad starts running, [Meta's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right people."[46]  Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers[]" (i.e., "Lookalike Audience[s]").[47]

45.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed. This allows [Meta clients] to create thousands of ads without having to configure each of them individually."[48]  Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[49]

---

[41] META, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[42] META, USE CONVERSION TRACKING TO MEASURE RESULTS, https://www.facebook.com/business/help/339239069606476.

[43] *Id.*

[44] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[45] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[46] *Id.*

[47] *Id.*

[48] META, META PIXEL FOR ADVANTAGE+ CATALOG ADS, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads.

[49] *Id.*

---

**V.    Defendant Aids, Agrees with, Employs, or Otherwise Enables the Third Parties to Wiretap Californians' Communications**

**A.    Adobe**

46.    Adobe, as enabled by Defendant, contemporaneously intercepts the following Website communications.



47.    As shown by the red highlights in the above excerpt of the Website's transmissions, Adobe intercepts the destination selected by users (here, "San Diego, CA"). As shown by the yellow highlights, Adobe intercepts the desired trip dates selected by users (here, "checkIn=2025-02-02" and "'checkOut=2025-02-06"). As shown by the green highlight, Adobe intercepts the numbers of rooms and guests selected by users (here, "rooms=1"; "adults=2"; and "children=1"). As shown by the blue highlights, Adobe intercepts the special rates selected by users (here, "senior discount"). These communications are the product of button clicks on Website Screen 1.

//

//

//

//

//

//

{requestId: "e8b05799ec684c8b8dcd82b2126545a0", context: {,…},…}
  ▼ context: {,…}
    ▼ address: {,…}
        referringUrl: "https://www.extendedstayamerica.com/search-results?location=San+Diego%2C+CA&lat=32.715738&lng=-117.1610838&searchType=City&nearby
        url: "https://www.extendedstayamerica.com/hotels/ca/san-diego/fashion-valley?propertyCode=EA%3BBEMVL&checkIn=2025-02-02&checkOut=2025-02-06&roo
      ▶ browser: {host: www.extendedstayamerica.com",…}
https://www.extendedstayamerica.com/hotels/ca/san-diego/fashion-valley?
propertyCode=EA%3BBEMVL&checkIn=2025-02-02&checkOut=2025-02-06&rooms=1&adults=2&children=1&rateType=SNR&code=&rate=Senior%
20Discount&accessible=off
  ▶ window: {width: 1368, height: 1041}
  ▼ execute: {pageLoad: {parameters: {pageName: "hotels:ca:san-diego Fashion-valley", pageType: "Hotel T",…},…}}
    ▼ pageLoad: {parameters: {pageName: "hotels:ca:san-diego Fashion-valley", pageType: "Hotel T",…},…}
      ▼ parameters: {pageName: "hotels:ca:san-diego Fashion-valley", pageType: "Hotel T",…}
          entity.address: "7444 Mission Valley Rd., San Diego, CA 92108"
          entity.amenities: "[{\"image\":\"https://www.extendedstayamerica.com/dA/e3d9c2d1d6db45c480df08b316fc58b4/esa_com_AmenityIcons_NonSmoking.svg\"
          entity.brand: "Suites"
          entity.categoryID: "CA:San Diego"
          entity.city: "San Diego"
          entity.daysToCheckin: 18
          entity.id: "9622"
          entity.landingFinder: "False"
          entity.metroName: "San Diego"
          entity.name: "San Diego - Fashion Valley"
          entity.newproperty: "No"
          entity.newthumbnailURL: "/dA/8c238825f1fd4392bc923c88d968b1a3/9622-HSD-E_exterior1_T.jpg"
          entity.pageType: "RoomListing"
          entity.pageURL: "/hotels/ca/san-diego/Fashion-valley"
          entity.phoneNumber: "1-619-299-2292"
          entity.renovatedproperty: "No"
          entity.search: "San Diego, CA"
          entity.state: "CA"
          entity.userinfo: "User"
          entity.userlogStatus: "LoggedOut"
          entity.zip: "92108"
          pageName: "hotels:ca:san-diego fashion-valley"

48.    As shown by the purple highlights in the above excerpt of the Website's transmissions, Adobe intercepts the particular Extended Stay America hotel selected by users (here, "Fashion Valley").  These communications are the product of button clicks on Website Screen 2.

{requestId: "8a653afbde4a436bb08cb31524aa2a62", context: {,…},…}
  ▼ context: {,…}
    ▼ address: {,…}
        referringUrl: "https://www.extendedstayamerica.com/hotels/ca/san-diego/fashion-valley?propertyCode=EA%3BBEMVL&checkIn=2025-02-02&checkOut=2025-02-
        url: "https://www.extendedstayamerica.com/reservations/index.html?propertyCode=EA%3BBEMVL&checkIn=2025-02-02&checkOut=2025-02-06&rateType=PROMO&
https://www.extendedstayamerica.com/reservations/index.html?
propertyCode=EA%3BBEMVL&checkIn=2025-02-02&checkOut=2025-02-06&rateType=PROMO&roomRateCode=PRNEWD&rateName=30th%20Birth
day%20Sale&adult=2&child=1&roomCode=DLX1KN&room=1&bookingCode=PRNEWD&code=EST95&hotelRoomTypeId=0e87189f-1648-45ff-96de-
300006394a56&confirmationNumber=&analyticsPlanName=Promotional%20Rate&roomNightlyRate=186.99&analyticsRateCode=PROMO&loginRequ
iredForRate=false&rateGroup=
      ▼ pageLoad: {parameters: {pageName: "reservations:guest-info", pageType: "GuestInfo",…},…}
        ▼ parameters: {pageName: "reservations:guest-info", pageType: "GuestInfo",…}
            entity.brand: "Suites"
            entity.id: "9622"
            entity.landingFinder: "false"
            entity.one2sixStay: "yes"
            entity.recoverySuccess2: "no"
            entity.recoverySuccess3: "no"
            entity.roomNights: 4
            entity.userinfo: "User"
            entity.userlogStatus: "LoggedOut"
            pageName: "reservations:guest-info"
            pageType: "GuestInfo"
            referrer: "https://www.extendedstayamerica.com/hotels/ca/san-diego/fashion-valley?propertyCode=EA%3BBEMVL&checkIn=2025-02-02&checkOut=2025-02-06
      ▼ profileParameters: {isCookieV2: "no", staylength: 4, customPersona: "Family"}
          customPersona: "Family"
          isCookieV2: "no"

49.    As shown by the brown highlight in the above excerpt of the Website's transmissions, Adobe intercepts the room type selected by users (here, "DLX1KN" as in deluxe with 1 king bed).  These communications are the product of button clicks on Website Screen 3.

1

2

3

      **B.**    **LinkedIn**

    50.    LinkedIn, as enabled by Defendant, contemporaneously intercepts the following

Website communications.

```
v: 2
fmt: js
pid: 4109498
time: 1736960465602
li_adsId: 7af04179-a964-4686-aabc-fe108c9acc47
url: https://www.extendedstayamerica.com/search-results?location=San+Diego%2C+CA&lat=32.715738&lng=-117.1610838&se
archType=City&nearbyProperties=7&checkIn=2025-02-02&checkOut=2025-02-06&rooms=1&rooms-spinbutton=1&adults=2&adult
s-spinbutton=2&children=1&children-spinbutton=1&Rate=Senior+Discount&rateType=SNR
```

51.     As shown by the red highlights in the above excerpts of the Website's transmissions, LinkedIn intercepts the destination selected by users (here, "San Diego, CA").  As shown by the yellow highlights, LinkedIn intercepts the desired trip dates selected by users (here, "checkIn=2025-02-02" and "'checkOut=2025-02-06"). As shown by the green highlights, LinkedIn intercepts the numbers of rooms and guests selected by users (here, "rooms=1"; "adults=2"; and "children=1"). As shown by the blue highlights, LinkedIn intercepts the special rates selected by users (here, "Senior Discount").  These communications are the product of button clicks on Website Screen 1.

```
v: 2
fmt: js
pid: 4109498
time: 1736971388376
li_adsId: 0782c787-972d-4acf-9a72-465a56b210b8
url: https://www.extendedstayamerica.com/hotels/ca/san-diego/fashion-valley?propertyCode=EA%3BBEMVL&checkIn=2025-
02-02&checkOut=2025-02-06&rooms=1&adults=2&children=1&rateType=SNR&code=&rate=Senior%20Discount&accessible=off
```

52.     As shown by the purple highlights in the above excerpt of the Website's transmissions, LinkedIn intercepts the particular Extended Stay America hotel selected by users (here, "Fashion Valley").  These communications are the product of button clicks on Website Screen 2.

```
v: 2
fmt: js
pid: 4109498
time: 1736971999192
li_adsId: 0782c787-972d-4acf-9a72-465a56b210b8
url: https://www.extendedstayamerica.com/reservations/index.html?propertyCode=EA%3BBEMVL&checkIn=2025-02-02&checkOut=2025-02-06&rateTyp
e=PROMO&roomRateCode=PRNEWD&rateName=30th%20Birthday%20Sale&adult=2&child=1&roomCode=DLX1KN&room=1&bookingCode=PRNEWD&code=EST95&hotel
RoomTypeId=0e87189f-1648-45ff-96de-300006394a56&confirmationNumber=&analyticsPlanName=Promotional%20Rate&roomNightlyRate=186.99&analyt
icsRateCode=PROMO&loginRequiredForRate=false&rateGroup=
```

53.     As shown by the brown highlight in the above excerpt of the Website's transmissions, LinkedIn intercepts the room type selected by users (here, "DLX1KN" as in deluxe with 1 king bed). These communications are the product of button clicks on Website Screen 3.

**C.     Meta**

54.     Meta, as enabled by Defendant, contemporaneously intercepts the following

Website communications.

id: 2438127043155298

ev: SubscribedButtonClick

dl: https://www.extendedstayamerica.com/

rl:

if: false

ts: 1736960121022

cd[buttonFeatures]: {"classList":"btn esa-btn-select dropdown-toggle esa-rooms-guests-dropdown-btn","destinat
ion":"https://www.extendedstayamerica.com/search-results","id":"widgetRoomDropdown","imageUrl":"","innerTex
t":"1 Room: 3 Guests","numChildButtons":0,"tag":"button","type":"button","name":"","value":""}

id: 2438127043155298

ev: SubscribedButtonClick

dl: https://www.extendedstayamerica.com/

rl:

if: false

ts: 1736960312372

cd[buttonFeatures]: {"classList":"btn esa-btn-select dropdown-toggle esa-special-rate-select","destinatio
n":"https://www.extendedstayamerica.com/search-results","id":"widgetRateDropdown","imageUrl":"","innerTex
t":"Senior Discount","numChildButtons":0,"tag":"button","type":"button","name":"","value":""}

cd[buttonText]: Senior Discount

id: 2438127043155298

ev: Search

dl: https://www.extendedstayamerica.com/search-results?location=San+Diego%2C+CA&lat=32.715738&lng=-117.1610838&searchType
=City&nearbyProperties=7&checkIn=2025-02-02&checkOut=2025-02-06&rooms=1&rooms-spinbutton=1&adults=2&adults-spinbutton=2&
children=1&children-spinbutton=1&rate=Senior+Discount&rateType=SNR

rl: https://www.extendedstayamerica.com/

if: false

ts: 1736970681082

cd[checkin_date]: 02/02/2025

cd[checkout_date]: 02/06/2025

cd[language_id]: EN

cd[city]: San Diego

cd[region]: CA

cd[num_adults]: 2

cd[country]: US

cd[num_children]: 1

cd[num_room]: 1

cd[num_Nights]: 4

cd[length of stay]: 4

cd[content_type]: hotel

55.     As shown by the red highlights in the above excerpts of the Website's transmissions,

Meta intercepts the destination selected by users (here, "San Diego, CA"). As shown by the yellow highlights, Meta intercepts the desired trip dates selected by users (here, "checkIn=2025-02-02" and "'checkOut=2025-02-06"). As shown by the green highlights, Meta intercepts the numbers of rooms and guests selected by users (here, "rooms=1"; "adults=2"; and "children=1"). As shown by the blue highlights, Meta intercepts the special rates selected by users (here, "Senior Discount"). These communications are the product of button clicks on Website Screen 1.

```
id: 2438127043155298
ev: ViewContent
dl: https://www.extendedstayamerica.com/hotels/ca/san-diego/Fashion-valley/propertyCode=EA%3BBEMVL&checkIn=2025-
02-02&checkOut=2025-02-06&rooms=1&adults=2&children=1&rateType=SNR&code=&rate=Senior%20Discount&accessible=off
rl: https://www.extendedstayamerica.com/search-results?location=San+Diego%2C+CA&lat=32.715738&lng=-117.1610838&se
archType=City&nearbyProperties=7&checkIn=2025-02-02&checkOut=2025-02-06&rooms=1&rooms-spinbutton=1&adults=2&adul
ts-spinbutton=2&children=1&children-spinbutton=1&rate=Senior+Discount&rateType=SNR
if: false
ts: 1736971388341
cd[checkin_date]: 02/02/2025
cd[language_id]: EN
cd[address.city]: San Diego
cd[num_adults]: 2
cd[address.country]: US
cd[num_children]: 1
cd[num_room]: 1
cd[num_Nights]: 4
cd[length of stay]: 4
cd[checkout_date]: 02/06/2025
cd[address.region]: CA
cd[content_id]: 9622
cd[1st property name]: San Diego - Fashion Valley
cd[content_type]: hotel
```

56.     As shown by the purple highlights in the above excerpt of the Website's transmissions, Meta intercepts the particular Extended Stay America hotel selected by users (here, "Fashion Valley"). These communications are the product of button clicks on Website Screen 2.

//

//

//

//

//

id: 2438127043155298
ev: InitiateCheckout
dl: https://www.extendedstayamerica.com/reservations/index.html?propertyCode=EA%3BBEMVL&checkIn=2025-02-02&checkOut=2025-02-06&rateType
=PROMO&roomRateCode=PRNEWD&rateName=30th%20Birthday%20Sale&adult=2&child=1&roomCode=DLX1KN&room=1&bookingCode=PRNEWD&code=EST95&hotelR
oomTypeId=0e87189f-1648-45ff-96de-300006394a56&confirmationNumber=&analyticsPlanName=Promotional%20Rate&roomNightlyRate=186.99&analyti
csRateCode=PROMO&loginRequiredForRate=false&rateGroup=

57.     As shown by the brown highlight in the above excerpt of the Website's transmissions, Meta intercepts the room type selected by users (here, "DLX1KN" as in deluxe with 1 king bed). These communications are the product of button clicks on Website Screen 3.

## VI.    Defendant Enables the Third Parties to Pair the Above Data with Users' Identities

58.     As discussed *supra*, § IV, the Adobe, LinkedIn, and Meta tracking technologies at issue can pair wiretapped data with website users' identities.

59.     The tracking technologies achieve this, at least in part, through cookies. A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[50] Persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[51]

### A.    Adobe

60.     Through the Adobe Experience Cloud Identity Service, in conjunction with the Adobe Experience Platform Identity Service, Adobe can identify individual website users with, *inter alia*, cookie IDs, cross-device IDs, device IDs, email addresses, and phone numbers.

61.      The following image confirms that Defendant has enabled the Adobe Experience Cloud Identity Service on the Website.

//

//

//

//

//

---

[50] PC MAGAZINE, COOKIE TABLE, https://www.pcmag.com/encyclopedia/term/cookie.

[51] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?, https://www.cookiebot.com/en/tracking-cookies/.



**B.      LinkedIn**

62.     Through LinkedIn cookies, LinkedIn can identify individual website users by their respective LinkedIn member accounts.

63.     The following image confirms that, when a user accesses the Website while logged into LinkedIn, the LinkedIn tracking technologies on the Website compel that user's browser to transmit several cookies, including the _guid; lms_ads; and lms_analytics cookies.



64.     The _guid cookie is "[u]sed to identify a LinkedIn Member for advertising through

Google Ads" and has a lifespan of ninety days.[52]

65.     The lms_ads cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising" and has a lifespan of thirty days.[53]

66.     The lms_analytics cookie is "[u]sed to identify LinkedIn Members off LinkedIn for analytics" and has a lifespan of thirty days.[54]

**C.    Meta**

67.     Through Facebook cookies, Meta can identify individual website users by their respective Facebook accounts.  Through advanced matching, Meta can also identify individual website users by the personal information they provide on websites (i.e., name, email address, phone number, etc.).

68.     The following image confirms that, when a user accesses the Website while logged into Facebook, the Meta tracking technologies on the Website compel that user's browser to transmit several cookies, including the c_user; datr; fr; and _fbp[55] cookies:

| Name | Value | Domain |
|---|---|---|
| _fbp | ▇▇▇▇▇▇▇▇▇ | .extendedstayamerica.com |
| fr | ▇▇▇▇▇▇▇▇▇▇▇ | .facebook.com |
| xs | ▇▇▇▇▇▇▇▇▇▇▇ | .facebook.com |
| c_user | ▇▇▇▇▇▇ | .facebook.com |
| wd | ▇▇▇ | .facebook.com |
| sb | ▇▇▇▇▇▇▇ | .facebook.com |
| presence | ▇▇▇▇▇▇▇▇ | .facebook.com |
| datr | ▇▇▇▇▇▇▇ | .facebook.com |

//

---

[52] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[53] Id.

[54] Id.

[55] Note, the Meta Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—i.e., the Website. PC MAGAZINE, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. PC MAGAZINE, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook. Pictured here and in the infra two images is the _fbp cookie, sent as a first-party cookie.

69.    The c_user cookie contains, at least, the user's unencrypted Facebook ID.[56]    The c_user cookie has a lifespan of three hundred sixty-five days.[57]

70.    The datr cookie contains, at least, a value that uniquely identifies a browser.[58]    The datr cookie has a lifespan of four hundred days.[59]

71.    The fr cookie contains, at least, a value that uniquely identifies a browser and the user's encrypted Facebook ID.[60]    The fr has a lifespan of ninety days.[61]

72.    The _fbp cookie contains, at least, a value that uniquely identifies a browser.[62]    The _fbp has a lifespan of ninety days.[63]

73.    When a Website visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies, including the datr, fr, and _fbp cookies:

| Name | Value | Domain |
|------|-------|--------|
| _fbp | ████████████████████ | .extendedstayamerica.com |
| wd | ██████ | .facebook.com |
| sb | ██████████████ | .facebook.com |
| fr | ████████████████████ | .facebook.com |
| datr | ████████████████ | .facebook.com |

---

[56] MICROSOFT, COOKIE COMPLIANCE, https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user[.] Description[:] Cookie contains the user ID of the currently signed-in user.").

[57] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[58] Id. ("'Datr' is a unique identifier for your browser[.]").

[59] Id.

[60] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf ("The first part of the cookie is a browser ID, used to identify the web browser. The second part of the cookie is an encrypted version of the logged in user's Facebook ID.").

[61] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[62] Id. ("Cookie[:] _fbp[.] Description[:] These cookies identify browsers for businesses using our Meta Products for the purposes of providing advertising and site analytics services."). See also FACEBOOK, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters#fbp ("The Facebook browser ID value is stored in the _fbp browser cookie[.]").

[63] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

74.     No matter the circumstances, Facebook compels the visitor's browser to transmit the _fbp cookie:

| Name | Value | Domain | ▲ |
|------|-------|--------|---|
| _fbp | ███████████████ | .extendedstayamerica.com | |

75.     Defendant also uses "Advanced Matching."  With Advanced Matching, Defendant's Meta Pixels "look for recognizable form field and other sources on [the] website that contain information such as first name, last name and email."[64]  That information is recorded, "along with the event, or action, that took place."[65]

76.     Specifically, as part of Advanced Matching, Defendant enabled "Automatic Advanced Matching."  That means Defendant configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[66]  The highlighted line below shows that Defendant enabled Automatic Matching.

```
150     fbq.loadPlugin("automaticmatchingforpartnerintegrations");
151     instance.optIn("2438127043155298", "AutomaticMatchingForPartnerIntegrations", true);
152     config.set(null, "batching", {
  -          "batchWaitTimeMs": 10,
  -          "maxBatchSize": 10
```

77.     Thus, Meta, as enabled by Defendant, contemporaneously intercepts users' names, email address, phone numbers, and/or other personal details using the Meta Pixel on various pages of the Website.  Although these personal details are "hashed,"[67] the reality is that, even in hashed form, they are traceable to individuals.[68]

---

[64] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/ business/help/611774685654668.

[65] *Id.*

[66] *See* META, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/ advanced-matching; META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/ business/help/611774685654668.

[67] *Id.*

[68] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS!

78.    Defendant discloses this information to Meta so that Meta can better match Website visitors to their Facebook profiles, thereby helping Defendant "[i]ncrease the number of attributed conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[69]

## VII.    The Third Parties Use Californians' Data for their Own Purposes

79.    When the Third Parties use their respective wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.    Instead, the Third Parties – separate and distinct entities from the parties to the conversations—use the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties.    The Third Parties, themselves, collect the contents of said conversations.    That data is then analyzed by the Third Parties before being provided to any entity that was a party to the conversations (like Defendant).

80.    The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes.

81.    In the "Adobe Experience Cloud Terms of Use," Adobe states: "You grant Adobe a worldwide, royalty-free, non-exclusive, transferable, and sublicensable license to adapt, display, distribute, modify, perform, publish, reproduce, translate, and use Your Materials for the purpose of operating, marketing and improving the Services and enabling your use of the Services."[70]    Adobe defines "Materials" as "any materials provided by You, Adobe, or a third party, including without limitation any (a) user material, including usage and telemetry activities; (b) reports, text, code, data, documents, images, photographs, graphics, audio, videos, or webcasts; (c) products; or (d)

---

PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[69] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

[70] ADOBE, ADOBE EXPERIENCE CLOUD TERMS OF USE, https://www.adobe.com/content/dam/cc/en/legal/servicetou/Experience_Cloud_TOU_en_WW_20220608.pdf.  See also ADOBE, LICENSES AND TERMS, https://www.adobe.com/legal/licenses-terms.html.

---

Software."[71]   Thus, Adobe has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, operating, marketing, and improving its services.

82.     In its "LinkedIn Ads Agreement," LinkedIn states: "As part of the Analytics services, to improve ad relevance and reach, LinkedIn may use your Audience Data, whether during or after the term of this Ads Agreement, to analyze and optimize LinkedIn algorithms and to find LinkedIn members probabilistically across devices[.]"[72] LinkedIn further states, in its "LinkedIn Data Processing Agreement," that it will "[p]rocess Customer Personal Data … for the purpose of providing, supporting and improving LinkedIn's services (including to provide insights and other reporting)[.]"[73]   In fact, it seems that, even "on termination of [] data processing services" by a LinkedIn client, LinkedIn "may continue to Process Customer Personal Data that has been aggregated in a manner that does not identify individuals or customers to improve LinkedIn's systems and services."[74]   Thus, LinkedIn has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, analyzing and optimizing LinkedIn's algorithms, finding LinkedIn members, and providing, supporting, and improving LinkedIn's systems and services.

83.     In its "Meta Business Tools Terms,"[75] Meta confirms that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant.   For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."[76]   Further, Meta can "disclose [] Campaign Reports or Analytics … to [] third part[ies,] … [if] they have been combined with Campaign Reports and Analytics from numerous other third parties and [the advertiser using the Meta Business Tools has had its]

---

[71] *Id.*

[72] LINKEDIN, LINKEDIN ADS AGREEMENT, https://www.linkedin.com/legal/sas-terms.

[73] LINKEDIN, LINKEDIN DATA PROCESSING AGREEMENT, https://www.linkedin.com/legal/l/dpa.

[74] *Id.*

[75] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[76] *Id.*

identifying information [] removed from the combined Campaign Reports and Analytics."[77]   And Meta can use the information it collects to "improve the effectiveness of ad delivery, [] determine the relevance of ads to people[,] … [and] personalize the features and content (including ads and recommendations) that [Meta] show[s] people on and off [] Meta Products."[78]   Thus, Meta has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, its own research and development; ad delivery; feature and content personalization; and product improvement, provision, and securement.

## VIII. Defendant Never Received Users' Consent to Disclose their Confidential Communications to the Third Parties

84.     Crucially, neither Defendant nor the Third Parties procure prior consent from Californians for Adobe, LinkedIn, or Meta to engage in this wiretapping.

85.     Nowhere on the Website does Defendant provide notice of its privacy-related practices that is prominently displayed, designed to attract Website users' attention, and distinctive in appearance.

86.     Nowhere on the Website does Defendant adequately disclose the tracking here at issue, including that:

- The Third Parties, as enabled by Defendant, intercept the contents of Californians' communications on the Website, in real time.

- These communications include, but are not limited to, "guest records," which are affirmatively entered by users on the Website and confidential under Cal. Civil Code § 53.5(c).  Namely, the Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay.  The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications.

- This information is not anonymized because Defendant enables the Third Parties to link users' communications with personal information that reveals their identities.  Such personal information includes cookie IDs/the values contained in cookies, cross-device IDs, device IDs, email addresses, and/or phone numbers, which constitute "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c).

---

[77] *Id.*

[78] *Id.*

87.    Nowhere on the Website does Defendant request or receive Website users' affirmative consent *prior to* enabling the Third Parties' tracking technologies.  Analysis of the Website reveals that the Third Parties' tracking technologies are active as soon as the Website loads, before Website users could even conceivably be put on notice or provide affirmative consent.

**CLASS ALLEGATIONS**

88.    Plaintiff seeks certification of the following class: all California residents who have accessed and navigated the Website while in California (the "Class").

89.    Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

90.    The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

91.    **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

92.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant

violated CIPA §§ 631 and 632 and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

93.   **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to the Third Parties.

94.   **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

95.   **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.   Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

//

//

//

//

//

//

//

## CAUSES OF ACTION

### COUNT I
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 631(a)

96.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

97.     Plaintiff brings this Count individually and on behalf of the members of the Class.

98.     CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

99.     CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022

WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

100.    The Third Parties' tracking technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

101.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, the Third Parties have the capability to use the wiretapped information for their own purposes.  Accordingly, Adobe, LinkedIn, and Meta were third parties to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

102.    At all relevant times, by their tracking technologies, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

103.    At all relevant times, the Third Parties used or attempted to use the communications intercepted by their tracking technologies for their own purposes.

104.    At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class Members using the Third Parties' tracking technologies and to accomplish the wrongful conduct at issue here.

105.    Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.  Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

106.    The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where the Third Parties – as enabled by

1    Defendant – routed Plaintiff's and Class Members' electronic communications to the Third Parties'

2    servers.

3        107.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured

4    by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of

5    Defendant's violations of CIPA § 631(a).

6                                  <u>COUNT II</u>
                    **Violation of the California Invasion of Privacy Act,**
7                              **Cal. Penal Code § 632**

8        108.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set

9    forth herein.

10       109.    Plaintiff brings this Count individually and on behalf of the members of the Class.

11       110.    CIPA § 632(a) prohibits an entity from:

12           intentionally and without the consent of all parties to a confidential
             communication, uses an electronic amplifying or recording device to
13           eavesdrop upon or record the confidential communication, whether the
             communication is carried on among the parties in the presence of one
14           another or by means of a telegraph, telephone, or other device, except a
             radio.
15

16       111.    The Third Parties' tracking technologies are "electronic amplifying or recording

17   device[s]." *Id.*

18       112.    Cal. Civ. Code § 53.5(a) states:

19           [A]n innkeeper, hotelkeeper, motelkeeper, lodginghouse keeper, or owner
             or operator of an inn, hotel, motel, lodginghouse, or other similar
20           accommodations, or any employee or agent thereof, who offers or accepts
             payment for rooms, sleeping accommodations, or board and lodging, or
21           other similar accommodation, shall not disclose, produce, provide, release,
             transfer, disseminate, or otherwise communicate, except to a California
22           peace officer, all or any part of a guest record orally, in writing, or by
             electronic or any other means to a third party without a court-issued
23           subpoena, warrant, or order.
24

25       113.    Per Cal. Civil Code § 53.5(c):

26           "Guest record" for purposes of this section includes any record that
             identifies an individual guest, boarder, occupant, lodger, customer, or
27           invitee, including, but not limited to, their name, social security number or
             other unique identifying number, date of birth, location of birth, address,
28

telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

114.    Here, Website users' communications with Defendant – made while browsing and booking Extended Stay America hotels via the Website – contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

115.    First, the communications include "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c). Defendant enables Adobe to identify individual Website users with the Adobe Experience Cloud Identity Service and/or Adobe Experience Platform Identity Service, which collect and utilize cookie IDs, cross-device IDs, device IDs, email addresses, and/or phone numbers. Defendant enables LinkedIn to identify individual Website users by their respective LinkedIn member accounts, utilizing several cookies, including the _guid; lms_ads; and lms_analytics cookies. Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies. Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., name, email address, phone number, etc.). These pieces of data collected by Adobe, LinkedIn, and Meta constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies and other IDs at issue contain "unique identifying number[s]" assigned to Website users (*id.*) and the contact details (i.e., name, email address, phone number, etc.) at issue are sufficient to identify individuals. *Id.*

116.    Second, Website users' communications with Extended Stay America "identif[y] an individual [as an Extended Stay America] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.* The Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay. The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications. These communications "identif[y] an individual [as an Extended Stay America] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Extended Stay America – individuals with "express

or implied invitation to enter or use [Extended Stay America's] premises. "[79]  These communications also identify certain Website users (those who complete the booking process) as Extended Stay America hotel "guests" and "customers."

117.    Thus, the Third Parties – as aided by Defendant – intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5.  Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because none of the Third Parties is "an entity contracted to provide services outlined in [a] contract [with Extended Stay America] that has no independent right to use or share the data beyond the terms of the contract." Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant.  Therefore, Defendant's conduct here at issue was not permitted by, *inter alia*, Cal. Civil Code § 53.5(i).

118.    When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5.  Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Adobe, LinkedIn, and Meta, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

119.    Plaintiff and Class Members did not consent to any of the Third Parties' actions.  Nor have Plaintiff or Class Members consented to the Third Parties' intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

120.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

---

[79] INVITEE, Black's Law Dictionary (11th ed. 2019).

1

## **PRAYER FOR RELIEF**

2       WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

3   judgment against Defendant, as follows:

4           (a)    For an order certifying the Class, naming Plaintiff as representative
                   of the Class, and naming Plaintiff's attorneys as Class Counsel to
5                  represent the Class;

6           (b)    For an order declaring that Defendant's conduct violates the statute
                   referenced herein;
7

8           (c)    For an order finding in favor of Plaintiff and the Class on all counts
                   asserted herein;

9           (d)    For actual, compensatory, statutory, and/or punitive in amounts to
                   be determined by the Court and/or jury;
10

11          (e)    For prejudgment interest on all amounts awarded;

12          (f)    For an order of restitution and all other forms of equitable monetary
                   relief;

13          (g)    For injunctive relief as pleaded or as the Court may deem proper;
                   and
14

15          (h)    For an order awarding Plaintiff and the Class their reasonable
                   attorneys' fees, expenses, and costs of suit.

16

17
## **JURY TRIAL DEMAND**

18      Plaintiff demands a trial by jury on all causes of action and issues so triable.

19

20  Dated:  February 27, 2025              Respectfully submitted,

21                                         **BURSOR & FISHER, P.A.**

22

23                                         By:___/s/ Philip L. Fraietta_____
                                                  Philip L. Fraietta
24

25                                         Philip L. Fraietta (State Bar No. 354768)
                                           1330 Avenue of the Americas, 32nd Floor
26                                         New York, NY 10019
                                           Telephone: (646)-837-7150
27                                         Facsimile:  (212) 989-9163
                                           Email: pfraietta@bursor.com

28

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*